Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Blanche Manning | Sitting Judge if Other than Assigned Judge | Nan R. Nolan |
|---|---|---|---|
| **CASE NUMBER** | 01 C 6916 | **DATE** | 3/21/2002 |
| **CASE TITLE** | Jessie E. Thompson, et al. vs. City of Chicago | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Report and Recommendation recommending that the District Court deny the City's motion to deny as moot the plaintiffs' preliminary injunction motion [18-1] is hereby entered of record.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | Document Number |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | |
| ✓ | Notices mailed by judge's staff. | MAR 22 2002 date docketed | 51 |
| | Notified counsel by telephone. | | |
| | Docketing to mail notices. | docketing deputy initials | |
| | Mail AO 450 form. | | |
| ✓ | Copy to judge/magistrate judge. | | |
| | courtroom deputy's initials | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JESSIE E. THOMPSON, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 01 C 6916 |
| ) | |
| CITY OF CHICAGO, ) | Judge Blanche M. Manning |
| ) | Magistrate Judge Nan R. Nolan |
| ) | |
| Defendant. ) | |

DOCKET

MAR 2 2

## REPORT AND RECOMMENDATION

This case has been referred to the Court for decision on the plaintiffs' motion for preliminary injunction. The Defendant City of Chicago subsequently moved to deny as moot the plaintiffs' preliminary injunction motion. (Docket Entry #18.) Following the March 7, 2002 through March 8, 2002 hearing on the issue of mootness, the Court recommends that the District Court DENY the City's motion to deny as moot the plaintiffs' motion because the City has not established that there is "no reasonable expectation that the putatively illegal conduct will be repeated, and that there are no remaining effects of the alleged violation." *Ragsdale v. Turnock*, 841 F.2d 1358, 1365 (7th Cir. 1988). In rendering this decision, the Court has considered the testimony of the witnesses, the documents admitted into evidence, the stipulations, pre-hearing submissions and arguments of the parties, and the relevant case law. Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court's findings of fact and conclusions of law are set forth below.

### Background

Section 8-4-010(f) of the Chicago Municipal Code states that "[a] person commits disorderly conduct when he knowingly: (f) Goes about begging or soliciting funds on the public ways, except

as provided in Chapter 10-8, Sections 10-8-110 through 10-8-170," (hereinafter "the panhandling ordinance").[1] It is undisputed that prior to October 30, 2001, the Chicago Police Department regularly enforced the panhandling ordinance. (*See* Hr'g Tr., Mar. 8, 2002, pp. 227-28, 266-67.) When enforcing the panhandling ordinance, officers either arrested individuals for panhandling or issued a ticket. (*Id.*, p. 218-19.) The police department also asked local businesses to display posters that cite the panhandling ordinance and state that "Panhandling is Illegal." (Def.'s Ex. 12; Hr'g Tr., Mar. 8, 2002, pp. 207-08.)[2] On September 6, 2001, the named plaintiffs—three individuals who panhandle in the City of Chicago—filed suit under 42 U.S.C. § 1983, alleging that the panhandling ordinance violates their rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution. (Compl. ¶ 1.)[3] The plaintiffs seek a declaratory judgment stating that the panhandling ordinance violates the First and Fourth Amendments, a preliminary and then a permanent injunction barring the City from enforcing the panhandling ordinance, money damages to be determined at trial, and costs and attorneys' fees. (First Am. Compl. ¶1.) On October 22, 2001, the plaintiffs moved the district court to enjoin the City from enforcing the panhandling ordinance. (Pls.' Mot. for Preliminary Inj., Docket Entry #4.) The district court subsequently referred the plaintiffs' preliminary injunction motion to this Court.[4]

---

[1] Chapter 10-8 allows individuals to solicit charitable donations provided they have a permit.

[2] The record contains evidence that the posters were distributed to businesses located within the police department's Eighteenth District. It is unclear whether the posters were displayed in other districts.

[3] The complaint also alleges that enforcement of the panhandling ordinance constitutes false arrest under Illinois law.

[4] After the referral, the plaintiffs filed a second amended complaint (adding two new counts) and an amended preliminary injunction motion. The City moved the district court to dismiss counts

The City primarily defends the plaintiffs' preliminary injunction motion on the ground of mootness. (Def.'s Resp. to Pls.' Mot. for Preliminary Inj., Docket Entry #12.) According to the City, the plaintiffs' claim for injunctive relief is moot because the police department ceased enforcing the panhandling ordinance on October 31, 2001. (*Id.*) On December 21, 2001, the City moved this Court to deny the plaintiffs' preliminary injunction motion as moot. (Def.'s Mot. to Deny Pls.' Mot. for Preliminary Inj., Docket Entry #18.) The plaintiffs responded that their claim was not moot because the panhandling ordinance was still being enforced. (Pls.' Resp. to Def.'s Mot. to Deny Pls.' Mot. for Preliminary Inj., Docket Entry #22.) Because the parties could not initially agree on the number of panhandling tickets and arrests that had occurred after the City announced its non-enforcement policy—the City asserted that there were only a few isolated incidents and the plaintiffs claimed that there were many incidents—the parties requested time to conduct discovery. By mid-February 2002, the parties had taken several depositions and the City had produced the then-available documentary evidence regarding the numbers of tickets issued and arrests made under the ordinance since October 30, 2001. On March 7 and 8, 2002, this Court held a two-day evidentiary hearing concerning the City's mootness argument.

Evidentiary Hearing

The evidence presented at the evidentiary hearing can be divided into the following three categories: (1) the police department's general method of informing officers of new policies and procedures; (2) the department's efforts to inform officers of the non-enforcement policy; and (3) the department's post-October 30, 2001 enforcement of the panhandling ordinance.

---

III and IV of the second amended complaint (the new counts). The district court has not yet ruled on the motion to dismiss. This opinion concerns only the claims in the first amended complaint and the plaintiffs' first preliminary injunction motion.

1. **Police Department's General Method of Informing Officers of New Policies and Procedures**

The Chicago Police Department is divided into twenty-five districts and a number of specialized units. (Hr'g Tr., Mar. 7, 2002, p. 34.) As a general matter, the police department informs individual police officers of new policies and procedures by issuing either a department directive or a facsimile message. (*Id.*, p. 22.)[5] Of these two methods of disseminating information, the normal procedure is to issue a published department directive. (*Id.*, pp. 22-23; Hr'g Tr., Mar. 8, 2002, p. 172.) "Publishing" in this context means printing copies of the directive and sending the copies to each police district and specialized unit. (Hr'g Tr., Mar. 7, 2002, pp. 24, 26.) For example, when a city or state ordinance is repealed, the police department prints 15,000 copies of an official notice of repeal and hand-delivers the copies to each district and specialized unit. (*Id.*, pp. 100, 128-29.) The copies of the published directive are then made available to individual officers. (*Id.*, pp. 27, 44; Hr'g Tr., Mar. 8, 2002, p. 173.) In the Fifth District, for example, individual officers can pick up copies of published directives at the front desk or in the roll-call room. (Hr'g Tr., Mar. 7, 2002, pp. 22, 27.) If the police department needs to disseminate information quickly, however, the department uses a facsimile message. (*Id.*, pp. 23, 78.) Like a published directive, a facsimile message is an official department document. (*Id.*, pp. 33, 79, 126.) Unlike a published directive, however, the police department does not make copies of facsimile messages available to individual officers. (*Id.*, p. 27; Hr'g Tr., Mar. 8, 2002, p. 173.) Instead, the facsimile message is pasted into the district's Commanding Officer's Book ("CO Book") and the information contained in the

---

[5] Department directives are further broken down into general orders, special orders, and department notices. (Hr'g Tr., Mar. 7, 2002, p. 23.) The parties did not present evidence regarding the differences between general orders, special orders, and department notices.

-4-

message may be read to the individual officers by the watch commander during roll call. (Hr'g Tr., Mar. 7, 2002, pp. 22, 39-40, 58, 65, 85; Hr'g Tr., Mar. 8, 2002, p. 182.)[6]

In addition to department directives and facsimile messages, the police department sometimes reinforces new policies and procedures through the department's Daily Bulletin. (Hr'g Tr., Mar. 7, 2002, p. 91.) The bulletin is a daily newsletter that is made available to individual police officers. (Hr'g Tr., Mar. 8, 2002, pp. 204-05.) In the Twenty-Third District, for example, copies of the Daily Bulletin are available at the front desk and in the roll-call room. (Hr'g Tr., Mar. 7, 2002, p. 59.) One side of the bulletin—referred to as the "hot sheet"—lists the license-plate numbers of vehicles recently reported stolen. (Hr'g Tr., Mar. 8, 2002, p. 204.) The reverse side of the bulletin contains information regarding death notices, educational opportunities available to officers, and individuals wanted for questioning or wanted on warrants, and also states the proper procedures to be followed in certain situations. (*See* Def.'s Ex. 4-11; Hr'g Tr., Mar. 7, 2002, p. 91; Hr'g Tr., Mar. 8, 2002, p. 204.) For example, the bulletin dated February 5, 2002, states that "[e]nforcement of M.C.C. 9-64-100(f), which prohibits parking within 20 feet of a crosswalk, requires the existence of a sign indicating the prohibition." (Def.'s Ex. 8.)

---

[6] Officers assemble at roll call to receive instructions for the upcoming watch. Each district holds multiple roll calls for each watch. (*See* Rayl Dep., p. 52.) At roll call, the watch commander inspects the officers, ensures that they have their assignments for that watch, provides them with any necessary information for that day, e.g., information regarding court appearances or community meetings, and, to the extent necessary, reads relevant portions of the CO Book. (Hr'g Tr, Mar. 7, 2002, p. 41.)

## 2. Police Department's Efforts to Inform Officers of the Non-Enforcement Policy

On October 30, 2001, the police department sent a facsimile message to the twenty-five districts and the specialized units regarding enforcement of the panhandling ordinance. The body of the message states:

> Effective immediately, Department Members **will no longer enforce Chapter 8-4-010(f)** of the Municipal Code which states:
>
> -- A person commits disorderly conduct when he knowingly:
>
> (f) Goes about begging or soliciting funds on the public ways.
>
> Officers will continue to enforce Chapter 10-8-110 through 10-8-170 which requires a permit for charitable solicitations on a public way. CTA Ordinance 98-126 (1.2) which prohibits solicitation and/or begging on property owned, operated or maintained by the CTA will also continue to be enforced.
>
> For further information, please contact the Office Of Legal Affairs, at [phone number].

(Def.'s Ex. 3 (emphasis in original); Pls.' Ex. 3 (emphasis in original).) The parties stipulate that this message was received by each police district on October 30, 2001, and that the message was pasted into each district's CO Book.

At the hearing, the parties presented evidence regarding whether the October 30 message was read at roll calls. The City presented only one police officer who testified that the October 30 message was read at roll call in his district. Patrick J. Blair, a bicycle patrolman from the First District, testified that he heard the non-enforcement policy announced at a roll call for the second watch. (*Id.*, p. 229.)[7] In contrast, the plaintiffs presented three police officers who testified that they

---

[7] The City also presented Ralph Zbierelski, a patrolman from the First District, who testified that he was aware of the non-enforcement policy because other officers told him about it and because the October 30 facsimile message was pasted into the First District's CO Book. (Hr'g Tr., Mar. 8, 2002, p. 267). Patrolman Zbierelski did not testify that he heard the non-enforcement policy

do not remember hearing the non-enforcement policy announced at any roll call and that they were not aware of the policy until very recently. (Hr'g Tr., Mar. 7, 2002, pp. 17-18, 46; Hr'g Tr., Mar. 8, 2002, p. 170.) Maryann Stanek, a field lieutenant from the Fifth District whose duties sometimes include running roll call, testified that she attends roll call on a daily basis and that she does not recall hearing the non-enforcement policy announced at roll call. (Hr'g Tr., Mar. 7, 2002, pp. 19-21, 43.) Field Lieutenant Stanek also testified that she first learned of the non-enforcement policy when she received a note from the police department's legal affairs division in mid- to late-January 2002. (*Id.*, p. 29-30.) Similarly, Sheila Magnus, a lieutenant from the Twenty-Third District who also occasionally runs roll call, testified that she does not recall hearing the non-enforcement policy announced at roll call and that she was not aware of the policy until mid- to late-February 2002, when she was notified that she would be deposed in connection with the this case. (*Id.*, pp. 49, 48-49.)[8] Jerry McGhee, a field training officer from the Sixth District who is responsible for training new recruits from the police academy, testified that he does not remember hearing the non-

---

announced at roll call.
    The City also read into the record the deposition testimony of Commander Dennis Rayl. Commander Rayl testified that he was a captain in the Twelfth District during the fall of 2001. (Rayl Dep., p. 3.) Although Commander Rayl stated that he "would have read" the October 30 facsimile message during roll call for the third watch, he testified that he had no independent recollection that he announced the non-enforcement policy during any roll call. (*Id.*, pp. 20, 52-53, 63.)

[8] Lieutenant Magnus testified that she went on vacation in the beginning of October and that she does not remember when she returned to work. (Hr'g Tr., Mar. 7, 2002, pp. 55-56.) She also testified that when she returned to work she reviewed the CO Book to bring herself back up to speed. (*Id.*, p. 64.)
    Lieutenant Magnus further testified that she was temporarily assigned to the Sixth District from November 29, 2001 until January 3, 2002. (*Id.*, p. 50.) She testified that she does not recall hearing the non-enforcement policy announced at a roll call during the time she was assigned to the Sixth District, nor does she recall that other officers discussed the non-enforcement policy in her presence during that period of time. (*Id.*, p. 51.)

enforcement policy announced at roll call and that he first learned of the policy at his deposition, which took place in late-February or early-March 2002. (Hr'g Tr., Mar. 8, 2002, pp. 170-71.) The parties did not present any other evidence regarding whether the City's non-enforcement policy was read at roll calls in the other twenty-one districts.[9]

The City also introduced a document that appears to be a copy of a November 2, 2001 facsimile message from the Patrol Division to all district commanders. (Def.'s Ex. 13.) The November 2 facsimile message instructs the district commanders to place the October 30 facsimile message in the district's CO Book and to read the message at roll call for seven consecutive days. (Def.'s Ex. 13; Hr'g Tr., Mar. 8, 2002, p. 222.) However, the City did not present any evidence that

---

[9] The City attempted to offer into evidence photocopies of CO Book pages from twenty-four of the twenty-five districts. The City asked the Court to infer that handwritten notations on some of the CO Book pages indicate that the non-enforcement policy was read at roll calls. (*See* Def.'s Proffered Exs. 14-38.) Although the plaintiffs stipulated to the fact that the October 30 facsimile message was received by each district and pasted into each district's CO Book, they objected to the introduction of the photocopied CO Book pages on the ground that the City failed to lay a foundation for the proffered exhibits. Hickey, who was a watch commander in the Third District from 1994 to 1997 and in the Eleventh District from 1997 to 1998, testified that he occasionally made notations in the CO Book to record that he announced certain messages at roll call. (Hr'g Tr., Mar. 7, 2002, pp. 88-89.) Hickey testified that although it was his practice to initial the CO Book, watch commanders are not required to initial CO Book pages. (*Id.*, p. 89.) The City also read into the record the deposition testimony of Commander Rayl, who was a watch commander in the Twelfth District in the fall of 2001. Commander Rayl testified that, according to his general practice, he initials CO Book pages to record that he had read the material on the page. (Rayl Dep., pp. 53, 63.) Commander Rayl did not testify that he initialed CO Book pages to record that he announced a certain message at roll call. The evidence presented at the hearing established that each district (and each watch commander) has its own practices and procedures. The City presented evidence as to the procedures of only two watch commanders, Hickey and Rayl. Of these two, only Rayl was a watch commander during the relevant time period and his testimony does not support the City's position that watch commanders initial CO Book pages to record that they announced a message at roll call. The City did not present any evidence establishing who wrote the notations in the photocopied CO Book pages or that watch commanders in any of the other twenty-four districts initial CO Book pages to record an announcement they made at roll call. The Court concludes that the City failed to establish the appropriate foundation for this evidence. Accordingly, the Court sustains the plaintiffs' objection to the introduction of this evidence.

-8-

the November 2 message was received by any district. The City also failed to present any evidence that the non-enforcement policy was read at roll calls on multiple days, much less evidence establishing that it was read at roll calls for seven consecutive days. (*E.g.,* Hr'g Tr., Mar. 7, 2002, pp. 124-25.)

The City took two other steps to disseminate the non-enforcement policy. It printed notices of the non-enforcement policy in eight issues of the Daily Bulletin—four in January 2002 and four in February 2002, (Def.'s Ex. 4-11; Hr'g Tr., Mar. 8, 2002, p. 205), and it retrieved the "Panhandling is Illegal" posters from local businesses, (Hr'g Tr., Mar. 8, 2002, pp. 208-09).

### 3. Post-October 30, 2001 Enforcement of the Panhandling Ordinance

The parties stipulated to the following facts relating to the number of arrests made and tickets issued pursuant to the panhandling ordinance since the City announced its non-enforcement policy. (Hr'g Tr., Mar. 7, 2002, pp. 5-6, 16; Pls.' Ex. 7.) From October 31, 2001 until early February 2002, the Chicago police department issued eighty-one panhandling tickets; the tickets were issued in twenty-one of the twenty-five police districts. During this period, the number of tickets has increased each month; police officers issued fifteen tickets in November (including one ticket issued on October 31), twenty-four tickets in December, and thirty-nine tickets in January.[10] From October 31, 2001 until mid-January 2002 (the period for which there is complete data), the Chicago police department cited the panhandling ordinance in ten arrest reports (though the ordinance was not always the sole reason cited for arrest). These arrests occurred in nine different police districts and throughout the relevant time period; in November, the panhandling ordinance is cited in three arrest

---

[10] At the time of the hearing, the City was not able to produce complete data regarding the tickets issued in February 2002. The then-available information indicates that the police department issued three panhandling tickets in early February 2002.

reports, in December, it is cited in two arrest reports, and for the first half of January, it is cited in five arrest reports. At this Court's request, on March, 15, 2002, the City filed a supplemental report containing updated ticket and arrest information. (Docket Entry #52.) The City's subsequent search uncovered thirteen additional panhandling tickets and five additional arrest reports that cite the panhandling ordinance.[11] Adding these tickets and arrests to the stipulated totals establishes that since October 31, 2001, the police department has issued ninety-four panhandling tickets and has cited the panhandling ordinance on fifteen arrest reports.[12]

In addition to the ticket and arrest information, Jessie Thompson—one of the named plaintiffs—testified that, since October 31, 2001, police officers have repeatedly threatened him with arrest for panhandling. (Hr'g Tr., Mar. 7, 2002, pp. 137-38.) According to Mr. Thompson, the officers told him that panhandling is illegal and that they would arrest him if he did not cease panhandling and leave the area. (*Id.*, pp. 137-38, 146.) Mr. Thompson testified that the most recent incident occurred in mid-February 2002. (*Id.*, p. 147.)[13]

---

[11] The City conducted its search on March 11, 2002. Because tickets are not entered into the City's computer system until the date of the administrative hearing, it is unclear whether the City's supplemental search uncovered all of the tickets issued in February 2002.

[12] On arrest reports and ticket forms, the reporting officer identifies the offense violated and provides a short narrative of the offender's conduct. Of the fifteen arrest reports, six reports cite the panhandling ordinance as the sole offense, three reports cite the general disorderly conduct ordinance and report that the offender was begging and blocking the doorway to a business, and six reports cite the panhandling ordinance and at least one other offense. Of the ninety-four tickets, eighty-six tickets cite only (1) the panhandling ordinance or (2) the general disorderly conduct ordinance and report that the suspect was begging. The eight remaining tickets cite either the panhandling or disorderly conduct ordinance and at least one other ordinance.

[13] On February 28, 2002, the City moved to postpone the evidentiary hearing based on the possibility that the City Council would repeal the panhandling ordinance. The Court denied the motion but invited the City to present testimony on the potential repeal of the ordinance. At the hearing, Robert Janega, an attorney for the City, testified that Mayor Richard M. Daley introduced

## Discussion

The panhandling ordinance prohibits panhandling on any public way in the City of Chicago. Chicago Mun. Code § 8-4-101(f). In *Loper v. New York Police Dep't*, 999 F.2d 699 (2d Cir. 1993), the Second Circuit held that a similar panhandling statute violated the First Amendment. In *Gresham v. Peterson*, 225 F.3d 899 (7th Cir. 2000), the Seventh Circuit rejected a constitutional challenge to an Indianapolis panhandling ordinance that prohibited "aggressive panhandling," but permitted peaceful panhandling at certain times and in certain locations. The Seventh Circuit noted that the *Gresham* ordinance was a "far cry from the total citywide ban on panhandling overturned by the court in *Loper*." *Gresham*, 225 F.3d at 907. After this suit was filed—and perhaps after reviewing *Loper* and *Gresham*—the City sent to each district the October 30 facsimile message, which states that department members are no longer to enforce the panhandling ordinance. The City contends that the October 30 facsimile message and its subsequent efforts to disseminate the non-enforcement policy, e.g., the notices in the Daily Bulletin, establishes that the plaintiffs' preliminary injunction motion is moot because the City has voluntarily ceased enforcing the panhandling ordinance.[14]

---

a proposal to repeal the panhandling ordinance. (Hr'g Tr., Mar. 8, pp. 160-61.) Janega also testified that Alderman Edward M. Burke introduced his own proposal relating to the panhandling ordinance. (*Id.*, pp. 165-67.) Both proposals have been referred to legislative committees. (*Id.*, pp. 160, 165.) After a committee has reviewed a legislative proposal, it reports the proposal to the City Council at the next regularly scheduled meeting. (*Id.*, p. 164.) However, any two aldermen can vote to table consideration of a legislative proposal. (*Id.*, p. 165.) Janega testified that he did not know whether the Daley and Burke proposals were "competing proposals." (*Id.*, p. 167.) Because the City did not rely on the potential repeal of the panhandling ordinance in its closing argument, the Court's opinion does not discuss the subject.

[14] The City also argues that the plaintiffs lack standing because the City is no longer enforcing the ordinance. The City confuses the doctrine of standing with the doctrine of mootness. Standing concerns whether the plaintiffs have the requisite personal interest in the case at the outset, i.e., when

Voluntary cessation of putatively illegal conduct "render[s] a controversy moot where there is no reasonable expectation that the putatively illegal conduct will be repeated, and there are no remaining effects of the alleged violation." *Ragsdale v. Turnock*, 841 F.2d 1358, 1365 (7th Cir. 1988); *see also Buckhannon Bd. and Care Home, Inc. v. West Virginia Dep't of Health and Human Resources*, 532 U.S. 598, 609 (2001) ("It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice unless it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.") (internal quotations and citation omitted). The defendant bears the heavy burden of establishing mootness. *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953); *Edwards v. Illinois Bd. of Admissions to the Bar*, 261 F.3d 723, 728 (7th Cir. 2001). One commentator has noted that a governmental entity's cessation of putatively illegal conduct "provides a secure foundation for mootness so long as it seems genuine." 13A Wright, Miller & Cooper, *Federal Practice and Procedure* § 3533.7, at 353 (2d ed. 1984). Although courts treat governmental claims of self-correction with more solicitude than similar action by private parties, *Ragsdale*, 841 F.2d at 1365, a governmental entity cannot moot a controversy "simply by professing that they have mended their ways," 13A Wright, Miller & Cooper, *supra*, § 3533.7, at 359. The governmental entity must still establish that there is no reasonable expectation that the putatively illegal conduct will continue

---

the complaint is filed, and mootness concerns whether the plaintiffs have a personal stake in the case throughout the litigation. *Friends of the Earth, Inc. v. Laidlaw Environmental Serv., Inc.*, 528 U.S. 167, 189 (2000); *Becker v. Federal Election Comm'n*, 230 F.3d 381, 387 n.3 (1st Cir. 2000). The City's standing argument, however, focuses solely on the City's efforts to cease enforcement of the ordinance—events that occurred after the plaintiffs filed suit. Accordingly, the Court rejects the City's standing argument.

and that there are no remaining effects from the alleged violation. *See Kikumura v. Turner*, 28 F.3d 592, 597 (7th Cir. 1994).

Since October 31, 2001—the date on which the City argues it voluntarily ceased enforcing the panhandling ordinance—police officers have arrested six individuals for panhandling and have issued at least ninety-four panhandling tickets.[15] Also, Mr. Thompson's testimony—which this Court finds credible—establishes that, despite the City's non-enforcement policy, police officers have threatened to arrest him for panhandling on a weekly basis.[16] The evidence presented at the hearing also establishes both that enforcement of the panhandling ordinance has increased each month since the City announced its non-enforcement policy, and that the ordinance has been enforced in a majority of police districts.

The City does not dispute these numbers. Instead, the City argues that there is a difference between tickets issued and arrests made pursuant to official City policy and the conduct of individual officers. The City contends that the October 30 facsimile message and the City's subsequent efforts to disseminate the non-enforcement policy demonstrate that the City has ceased enforcing the panhandling ordinance. Without citing any legal authority, the City argues that it is not responsible for officers who act in violation of the City's non-enforcement policy. Regardless of the legal merit of this argument, the Court notes that the City's position is based on its assumption that it effectively communicated the non-enforcement policy to individual police officers. The record in this case does

---

[15] Additionally, during the same period of time, police officers have cited the panhandling ordinance on nine other arrest reports—though panhandling was not the sole reason cited for arrest.

[16] For purposes of the present motion, this Court makes no distinction between these different methods of enforcing the panhandling ordinance. All three methods result in the suppression of protected speech. *See Gresham v. Peterson*, 225 F.3d 899, 904 (7th Cir. 2000) (collecting cases holding that begging is protected speech).

-13-

not support that assumption. The record contains no evidence that the non-enforcement policy was announced at roll calls in twenty-four of the twenty-five districts. Moreover, despite knowledge that police officers were still enforcing the panhandling ordinance, the City did not distribute copies of the non-enforcement policy to individual police officers. The City argues that the reminders printed in the Daily Bulletin notified officers of the non-enforcement policy. The Court concludes, however, that there is a difference between a reminder printed in a daily newsletter along with various other information and an individual document issued to each police office setting forth a change in department policy. This conclusion is supported by the police department's own procedure. When the department issues a published directive, the department makes copies of the directive available to individual police officers—the department does not simply rely on a notice printed in the Daily Bulletin. (*E.g.*, Hr'g Tr., Mar. 7, 2002, p. 27.) James K. Hickey, the former commanding officer of the Policies and Procedures section in the Research and Development division of the City's Legal Department, testified that a published directive is the preferred method for communicating information to individual officers because the published directive is then incorporated into the police department's directive system. (*Id.*, pp. 74, 108, 126.) Accordingly, the Court concludes that the record does not support the City's contention that it effectively communicated the non-enforcement policy to individual police officers.

The City next argues that the number of tickets and arrests is too small to constitute a reasonable expectation that enforcement of the panhandling ordinance will continue. To support this argument, the City compares the post-October 30 panhandling tickets and arrests to the total number of tickets issued of arrests made by the Chicago police department. Specifically, the City states that the ninety-four tickets and the fifteen arrest are insignificant when compared to the 91,000 tickets

issued for all offenses in the year 2001 and the approximately 80,000 arrests made for all offenses in the last four months. The Court finds this argument unpersuasive because the City did not select the appropriate comparison group. If the City wanted to show that enforcement of the panhandling ordinance has decreased since it announced its non-enforcement policy, the City should have presented statistics on the pre- and post-October 30 enforcement of the ordinance. Enforcement of any particular statute or ordinance is likely to be dwarfed by the police department's overall statistics. It does not follow, however, that the enforcement of that individual statute or ordinance is insignificant.

The only question that this Court must answer is whether the City has established that there is no reasonable expectation that the panhandling ordinance will be enforced in the future and that there are no remaining effects of the City's former policy of enforcing that ordinance. In *Ragsdale*, the Seventh Circuit concluded that the plaintiffs' challenge of a specific regulation was moot based on the fact that the state had not enforced that regulation in the five years preceding the suit. *Ragsdale*, 841 F.2d at 1365. Similarly, in *Jews for Jesus Inc. v. Hillsborough County Aviation Authority*, 162 F.3d 627, 629 (11th Cir. 1998), the Eleventh Circuit held that the plaintiff's challenge to an airport's literature distribution policy was moot because the defendant rescinded the policy three years ago and had not enforced it since. In contrast, in this case, the City has enforced the panhandling ordinance over 100 times in the last four months. Furthermore, the evidence establishes both that enforcement of the ordinance has increased over this period of time and that enforcement of the ordinance has occurred in a majority of police districts. Although the City does not need to show that there is a zero chance of future enforcement, *Moore v. Thieret*, 862 F.2d 148, 150 (7th Cir.

1989), it must demonstrate that there is no reasonable expectation of future enforcement. Based on this record, the Court concludes that the City has not met this heavy burden.

The City suggests that it has taken every possible step to effectively communicate its non-enforcement policy to individual police officers. The Court disagrees. The City could have issued a published directive instructing officers not to enforce the panhandling ordinance. The City contends that it did not issue a published directive because it wanted to disseminate the non-enforcement policy quickly. While that reason explains the initial decision to issue a facsimile message, it does not explain why the City has not followed up the facsimile message with a published directive. Hickey testified that it would take less than a month to issue a published directive notifying officers that they should not enforce a repealed ordinance. (Hr'g Tr., Mar. 7, 2002, p. 100.) Alternatively, instead of issuing a published directive, the City could have printed copies of the non-enforcement policy and made the copies available to individual police officers. The City has not explained why it has not issued a published directive or distributed copies of the non-enforcement policy to individual police officers in the four and one-half months that have passed since it issued the October 30 facsimile message.

## Conclusion

For the foregoing reasons, this Court recommends that the District Court DENY the City's motion to deny as moot the plaintiffs' preliminary injunction motion. Any objections to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this notice. *See* Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b)(1). Failure to object constitutes waiver of the right to appeal. *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

ENTER:

*Nan R Nolan* (signature)

**Nan R. Nolan**

**United States Magistrate Judge**

Dated: March 21, 2002